IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | |
|---|---|
| MELANIE COX, | ) |
| Plaintiff, | ) |
| v. | ) CASE NO. 3:20-CV-705-KFP |
| PHILIP FRETWELL, | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Melanie Cox brings this suit against Defendant Philip Fretwell, her adoptive father, alleging breach of contract and unjust enrichment based on Defendant's receipt of Plaintiff's mother's (and Defendant's ex-wife's) survivor benefits. Before the Court is Defendant's Motion for Summary Judgment (Doc. 29) and supporting memorandum (Doc. 31) in which, among other things, Defendant seeks dismissal of this case pursuant to the domestic relations exception to diversity jurisdiction. Plaintiff filed a response in opposition (Doc. 33), arguing that the domestic relations exception is inapplicable in this case. Upon careful review of the parties' submissions and relevant case law, the Court finds that this case should be DISMISSED for the reasons set forth below.

I.      **RELEVANT UNDISPUTED FACTS**[1]

Defendant married Cherie Fretwell in June of 1977. Docs. 27-1 at 2; 27-2 at 8:7-14. At that time, Cherie had one child, Plaintiff. After Defendant and Cherie married, Defendant adopted Plaintiff. Doc. 27-2 at 29:20-30:2. Defendant and Cherie then had one child together, Matthew. *Id.* at 29:14-17.

Cherie worked for the State of Alabama at Troy University Phenix City. Doc. 27-4 at 104:4-7. During her employment, Cherie contributed to a retirement/pension account the Retirement Systems of Alabama ("RSA") maintained. *Id.* at 104:11-14. On September 8, 1986, Cherie completed a Beneficiary Designation Form, designating a beneficiary, in the event of her death before retirement, of her total contributions toward retirement and death benefits associated therewith. Doc. 27-5. Defendant, referenced as Cherie's "Husband," is designated as the primary beneficiary, and Plaintiff is designated as the contingent beneficiary. *Id.* at 2.

On September 23, 2010, Defendant and Cherie divorced pursuant to a Lee County Circuit Court Judgment of Divorce. Doc. 27-6. Defendant and Cherie entered into a settlement agreement that was filed in the divorce action and incorporated into and made part of the divorce judgment. *Id.* at 2 (ordering that the settlement agreement "be incorporated herein and made a part hereof and enforceable as if written herein"), 3-6. In furtherance of the execution of the settlement agreement, Defendant and Cherie also

---

[1] These facts derive from Defendant's memorandum in support of his motion for summary judgment (Doc. 31) and Plaintiff's memorandum in support of her motion for partial summary judgment (Doc. 28), which is also before the Court but not the subject of this Order. The facts are undisputed unless otherwise noted.

2

entered into a Settlement of Assets (the "waiver"), which was attached to and incorporated into the agreement. *Id.* at 7-8. Defendant freely and voluntarily signed both the agreement and the waiver before a Notary Public. Docs. 27-1 at 4; 27-6 at 6, 8. He also initialed each page of each document. Doc. 27-6. Defendant, who has a Ph.D., acknowledges that he read and understood the terms of both documents when he signed them. Doc. 27-2 at 26:13-27:8.

The settlement agreement provides, in part, "[Defendant] does hereby waive the right to claim any interest in any retirement or investment plan of [Cherie]."[2] Doc. 27-6 at 4. The waiver further provides, in part:

> [Defendant] relinquishes all of the following possessions owned by [Cherie] and quits claim and relinquishes ownership claims to all of the following:
>
> [. . .]
>
> All retirement benefits accrued to [Cherie] from her State of Alabama job at Troy University Phenix City, including death benefits therefrom[.]
>
> Any claims to any life insurance policy or other insurance accruals owned by [Cherie].

*Id.* at 7. Defendant acknowledges that he waived his rights to Cherie's survivor benefits upon execution of the agreement, waiver, and judgment. Doc. 27-1 at 5. He further acknowledges that Cherie waived her rights to his IRAs and other investment accounts. Doc. 27-2 at 23:1-7; 24:9-13. He testified that they were both happy with their agreement,

---

[2] The settlement agreement also provides, under a heading entitled "TERMS OF THE JUDGMENT OF DIVORCE," that "the Parties do agree that the Court should adopt the terms of this agreement as the terms of the Judgment of Divorce and make the terms of this agreement enforceable as if set forth in the Judgment of Divorce." Doc. 27-6 at 3.

which was that he would not take her property, and she would not take his. *Id.* at 62:5-11; 77:8-16.

In or about 2017, Defendant made his first and only will. *Id.* at 30:10-12; 31:15-23. Defendant informed Cherie of this fact, and he told her that he was not providing for Plaintiff, his adopted daughter, in the will. *Id.* at 31:3-10. In turn, Cherie informed Plaintiff that Defendant was not providing for Plaintiff in his will, and she advised Plaintiff that Defendant would take care of Matthew and Cherie would take care of Plaintiff. Doc. 27-3 at 54:10-19; 57:2-14. Based on this conversation, Plaintiff believes Cherie thought that, due to the language in the divorce judgment, Plaintiff would receive her retirement and death benefits.[3] *Id.* at 54:10-19; 57:2-14; 86:15-87:9; 87:23-88:19. However, after the divorce, Cherie failed to change or execute a new Beneficiary Designation Form before she passed away unexpectedly in October of 2018.[4] Doc. 27-4 at 104:15-20. At the time of her death, the beneficiary designation on all of Cherie's accounts with RSA listed Defendant—still designated as her husband—as the primary beneficiary with Plaintiff as the contingent beneficiary. *Id.* at 43:11-44:4.

---

[3] Defendant disputes that Cherie actually thought this, arguing that there is no evidentiary basis for that conclusion. Doc. 32 at 3.

[4] Defendant also did not change the beneficiary designation on his investment accounts until after Cherie's death, stating, "I just don't keep up with things like that." Doc. 27-2 at 53:20-54:12. It was not until December 21, 2018 that Defendant changed his beneficiary designation from Cherie to Matthew and two of his other children from previous marriages. Doc. 27-7.

On or about November 26, 2018, Defendant submitted an Application for Survivor Benefits to RSA.[5] Doc. 27-8. Defendant did not advise RSA that he previously agreed to relinquish all claims to Cherie's retirement account, death benefits, and life insurance maintained by RSA, claiming it was his "understanding that . . . RSA was already aware of the existence of the [w]aiver when he submitted his paperwork to them." Doc. 27-1 at 5-6. Defendant testified that he did not feel the need to tell RSA about the settlement agreement and waiver incorporated into the divorce judgment because Cherie had left him an "inheritance." Doc. 27-2 at 42:7-43:10. On or about January 31, 2019, RSA paid Defendant a sum of $386,251.04 in survivor benefits. Doc. 27-11. The funds consisted of $245,302.04 in Cherie's contributions and refundable interest; $125,949 in preretirement death benefits; and $15,000 in term life insurance proceeds.[6] *Id.*

## II.    DISCUSSION

In his motion, Defendant argues that the Court should dismiss this action in light of the domestic relations exception to diversity jurisdiction, as it is an action to enforce a state court-issued divorce judgment over which the Lee County Circuit Court has continuing jurisdiction. In response, Plaintiff argues that this action is merely to enforce the settlement agreement, not the divorce judgment, and therefore the exception should not apply. Upon

---

[5] Defendant contends that he submitted this application to RSA only after RSA sent him the application form. Docs. 31 at 13; 32 at 3.

[6] RSA "always" follows "the indications of the member" in making its payout determinations. Doc. 27-4 at 47:5-15. Based on this language, the parties dispute whether RSA also considered the divorce judgment, and all the documents incorporated therein, in its decision to make payment to Defendant. *See* Docs. 28 at 14; 32 at 3-4.

consideration of the parties' arguments, the Court finds that this case does fall within the domestic relations exception for the following reasons.

### A. History of the Domestic Relations Exception

The Supreme Court has long recognized that "domestic relations are preeminently matters of state law." *Mansell v. Mansell*, 490 U.S. 581, 587 (1989); *Moore v. Sims*, 442 U.S. 415, 435 (1979) ("Family relations are a traditional area of state concern"). In light of the States' strong interest in matters of domestic relations, federal courts have recognized a "domestic relations" exception when federal courts are asked to exercise jurisdiction in certain cases touching upon familial relations. The Supreme Court has noted, however, that the domestic relations exception is not "compelled by the text of the Constitution or federal statute." *Marshall v. Marshall*, 547 U.S. 293, 299 (2006).

Rather, it is a judicially created doctrine "stemming in large measure from misty understandings of English legal history." *Id.* It originated in the dicta of two Supreme Court cases. *See Ex parte Burrus*, 136 U.S. 586, 593–94 (1890) ("The whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the states, and not to the laws of the United States."); *Barber v. Barber*, 62 U.S. 582, 584 (1858) ("We disclaim altogether any jurisdiction in the courts of the United States upon the subject of divorce, or for the allowance of alimony."); *see generally Jones v. Brennan*, 465 F.3d 304, 306–07 (7th Cir. 2006) (examining the historical origins of the doctrine); *Spindel v. Spindel*, 283 F. Supp. 797, 802–11 (E.D.N.Y. 1968) (same).

Some courts have construed the doctrine to be a type of prudential abstention rather than a divestment of jurisdiction. *See Rash v. Rash*, 173 F.3d 1376, 1380 (11th Cir. 1999)

(noting that the domestic relations "exception is narrowly confined; it is not an absolute rule, but rather the question is whether the court in its discretion should abstain"); *Jagiella v. Jagiella*, 647 F.2d 561, 564 n.11 (5th Cir. Unit B 1981) (noting the debate whether the domestic relations exception is a matter of abstention or an actual lack of jurisdiction). The Fifth Circuit noted prudential reasons for federal courts to abstain from adjudicating domestic relations cases: "the strong state interest in domestic relations matters, the competence of state courts in settling family disputes, the possibility of incompatible federal and state court decrees in cases of continuing judicial supervision by the state, and the problem of congested dockets in federal courts." *Crouch v. Crouch*, 566 F.2d 486, 487 (5th Cir. 1978); *see Jones*, 465 F.3d at 307 (observing that "state courts are assumed to have developed a proficiency in these matters, to have procedures tailored to them, and to work closely with and even employ specialized staff not found in federal courts").

Whether the domestic relations exception is a theory of abstention or an actual divestment of jurisdiction, courts have long accepted this enduring doctrine and Congress has done nothing to undermine or limit it. As Judge Friendly observed:

> More than a century has elapsed since the *Barber* dictum without any intimation of Congressional dissatisfaction. It is beyond the realm of reasonable belief that, in these days of congested dockets, Congress would wish the federal courts to seek to regain territory, even if the cession of 1859 was unjustified. Whatever Article III may or may not permit, we thus accept the *Barber* dictum as a correct interpretation of the Congressional grant.

*Phillips, Nizer, Benjamin, Krim & Ballon v. Rosenstiel*, 490 F.2d 509, 514 (2d Cir. 1973); *see also Ankenbrandt v. Richards*, 504 U.S. 689, 703 (1992) ("Given the long passage of time without any expression of congressional dissatisfaction, we have no trouble today

reaffirming the validity of the exception as it pertains to divorce and alimony decrees and child custody orders.").

### B. Scope of the Domestic Relations Exception

In 2015, the Eleventh Circuit addressed the scope of the domestic relations exception in *McCavey v. Barnett*, 629 F. App'x 865 (11th Cir. 2015). The *McCavey* Court noted that, while the exception should be narrowly confined and is not applicable to every case involving a dispute between present or former spouses, it nevertheless applies to "cases involving divorce . . . and enforcement of separation or divorce decrees still subject to state court modification." *Id.* at 867 (quoting *Carver v. Carver*, 954 F.2d 1573, 1578 (11th Cir. 1992) (internal quotation marks omitted) and citing *Ankenbrandt*, 504 U.S. at 701–02 (explaining that the exception was intended to keep federal courts from hearing cases that "seek the granting or modification of a divorce or alimony decree")). The Court further noted that a district court should abstain from cases in which the following policies are present: (1) there is a strong state interest in domestic relations; (2) the state courts can competently settle the family dispute; (3) the state continues to supervise the decrees; and (4) federal dockets are congested. *Id.* (citing *Stone v. Wall*, 135 F.3d 1438, 1441 (11th Cir. 1998) (citing *Ingram v. Hayes*, 866 F.2d 368, 370 (11th Cir. 1988))).

Although the facts in *McCavey* are not identical to those present here[7], the Court ultimately affirmed the application of the domestic relations exception, stating:

---

[7] In short, *McCavey* dealt with a trust in which the plaintiff and defendant, who were once husband and wife, served as co-trustees and their four children were beneficiaries. The trust was made part of the couple's subsequent divorce proceedings when, as part of those proceedings, the husband was ordered to transfer title of property from the trust to his soon-to-be ex-wife.

8

> Although [the plaintiff] insists that his suit concerns only trust and contract law and that a review of the state court's divorce decree is unnecessary, the relief he seeks ultimately requires the federal court to consider the propriety of the divorce decree's division of the trust property. This we cannot do. *See Ingram*, 866 F.2d at 370. Indeed, **federal courts will not review or modify a state court divorce order even when the plaintiff couches the claims in other terms.** *See McLaughlin v. Cotner*, 193 F.3d 410, 412–13 (6th Cir. 1999) (explaining that the wife's breach of contract action in connection with the disposition of marital property, namely a separation agreement to sell the marital home that was incorporated into the divorce decree, fell under the exception). Thus, because [the plaintiff] seeks to have a federal court review the division of marital property as determined in his divorce proceedings, such review falls within the domestic relations exception, and the district court properly determined that it lacked subject-matter jurisdiction under that rule.

*Id.* (emphasis added). Notably, the Sixth Circuit case cited favorably by the *McCavey* Court, *McLaughlin v. Cotner*, 193 F.3d 410 (6th Cir. 1999), dealt with a situation similar to the one here. In that case, a wife and husband entered into a separation agreement that was subsequently incorporated into a divorce decree. The plaintiff argued that the domestic relations exception should not apply because she was not suing for divorce, but merely for breach of contract.

> In rejecting that argument and applying the exception, the Court stated:
>
> Plaintiff is attempting to disguise the true nature of the action by claiming that she is merely making a claim for damages based on a breach of contract. However, the alleged "contract" is part of a separation agreement that was voluntarily entered into by the parties, and the separation agreement was incorporated into the divorce decree. This case thus involves issues arising out of conflict over a divorce decree, and, according to *Ankenbrandt*, comes within the "domestic relations exception."

*Id.* at 413. The Court continued:

> In the present case, the separation agreement containing the clause [at issue in the lawsuit] was incorporated into the divorce decree, and consequently, the obligations now imposed are not those imposed by the law of contract or

9

torts, as plaintiff contends, but are those imposed by the divorce decree. Therefore, the federal court lacks jurisdiction, as this case is not a tort or contract suit that merely has domestic relations overtones, but is one seeking a declaration of rights and obligations arising from marital status.

*Id.* at 414.

### C.   Application of the Exception in this Case

Like the plaintiffs in *McCavey* and *McLaughlin*, Plaintiff in this case argues that this suit "involves a simple interpretation of a contract." Doc. 33 at 9. She contends:

> Although the settlement agreement was incorporated into a judgment of divorce, the sole issue for resolution by this Court is whether Defendant was prohibited from receiving Cherie's retirement account, death benefits, and term life insurance maintained by RSA due to his waiving the right to them in the settlement agreement—a contract. Indeed, the only involvement of the judgment of divorce is the fact that the settlement agreement was incorporated into it.

*Id.* at 9-10. However, the Court disagrees that, under the circumstances of this case, it can simply disentangle the settlement agreement from the divorce decree in which it was incorporated. Indeed, the Eleventh Circuit has made clear that this Court cannot "review . . . a state court divorce order even when the plaintiff couches the claims in other terms." *McCavey*, 629 F. App'x at 867 (citing *McLaughlin*, 193 F.3d at 412–13). In making that statement, the Eleventh Circuit relied on *McLaughlin*, in which the Sixth Circuit held that a settlement agreement later incorporated into a divorce decree could not be separated from the divorce decree and thus fell within the domestic relations exception.

Recognizing that the exception should be narrowly applied in limited circumstances, the Court nevertheless finds that those circumstances exist here. As a general matter, the core of this dispute is decidedly familial, as the parties ask the Court to determine whether

an adoptive father—Defendant—unlawfully or unfairly acquired his ex-wife's benefits at the expense of his adopted daughter—Plaintiff. More importantly, the Court cannot determine whether Defendant was entitled to the benefits he received without analyzing the language of the divorce judgment issued in state court.[8] It is undisputed that the Lee County Circuit Court has continuing jurisdiction over the divorce judgment, and that court may very well have a different interpretation of its language and command a different outcome of the case than this Court. Thus, the settlement agreement cannot be cleanly separated from the divorce decree in which it was incorporated; no matter how the issue is labeled, Plaintiff ultimately seeks to have this Court review and interpret the obligations imposed by the divorce proceedings, which the Court cannot do.[9] *See McCavey*, 629 F. App'x at 867. Accordingly, this case must be DISMISSED pursuant to the domestic relations exception.

---

[8] Indeed, the divorce judgment specifically provides that the settlement agreement was "made a part hereof and [made] enforceable as if written herein." Doc. 27-6 at 2.

[9] Indeed, Plaintiff appears to recognize the confluence of these documents, as she refers to the divorce judgment—rather than the settlement agreement—throughout her motion for partial summary judgment. *See, e.g.,* Doc. 28 at 11 ("Cherie thought that due to the language in the Judgment, Plaintiff would receive her retirement and death benefits."), 13 ("Defendant could have signed a disclaimer of benefits form . . . in compliance with the Judgment"), 14 ("RSA failed to consider the Judgment"), 27 ("Defendant disregarded the obligations imposed by the Judgment"). Plaintiff's repeated reference to the divorce judgment, rather than the settlement agreement therein, and insistence that Defendant failed to meet the judgment's obligations further illustrates the inextricable nature of the two documents.

**III.   CONCLUSION**

Accordingly, for the reasons set forth above, it is ORDERED that:

1. Defendant's Motion for Summary Judgment (Doc. 29) is GRANTED to the extent that this case is subject to dismissal pursuant to the domestic relations exception to diversity jurisdiction;

2. This case is DISMISSED pursuant to that exception; and

3. This case is CLOSED.

DONE this 7th day of February, 2022.

/s/ Kelly Fitzgerald Pate
KELLY FITZGERALD PATE
UNITED STATES MAGISTRATE JUDGE